

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:CRH/JGH/JEA
F. # 2014R00196

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 2, 2020

By ECF

Honorable Sterling Johnson Jr.
United States District Judge
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Noelle Velentzas
      Criminal Docket No. 15-213 (S-2) (SJ)

Dear Judge Johnson:

  The government respectfully submits this letter regarding sentencing of the defendant Noelle Velentzas ("Velentzas"), scheduled for March 5, 2020. On August 23, 2019, Velentzas pleaded guilty pursuant to a plea agreement to teaching and distributing information pertaining to the making and use of an explosive, destructive device, and weapon of mass destruction, intending that it be used to commit a crime of violence, in violation of 18 U.S.C. §§ 842(p)(2)(A) and 844(a)(2).

  For the reasons set forth below, the government respectfully submits that a sentence of 240 months' imprisonment, which is the advisory United States Sentencing Guidelines ("Guidelines or "U.S.S.G.") sentence, is sufficient but not greater than necessary to ensure the goals of sentencing.

I. Background

  From May 2013 through their arrest in April 2015, Velentzas and her co-defendant Asia Siddiqui ("Siddiqui") learned and taught each other how to create an explosive device to be detonated in a terrorist attack in the United States, specifically aimed at law enforcement.[1] In a series of meetings with an undercover law enforcement officer (the "UC") throughout that time period, Velentzas and Siddiqui discussed various historical terrorist attacks, including the first World Trade Center bombing, the Oklahoma City Bombing, and

---

[1] On January 9, 2020, this Court sentenced Siddiqui to fifteen years' imprisonment for her role in the charged offense.

the Boston Marathon attack, as well as attempted attacks like the 2010 attempted bombing of Times Square. They researched how to execute similar attacks, including seeking out and collecting the material components needed to create the explosives used in those attacks. Pursuant to the plea agreement, Velentzas has stipulated to a set of facts that describe her and Siddiqui's conduct in greater detail (the "Stipulated Facts"). The Stipulated Facts, which are attached to the plea agreement, are also attached hereto as Exhibit 1 and incorporated by reference. Many of the key facts of Velentzas's conduct are discussed below.

      A.      Velentzas and Siddiqui Supported Radical Jihadism and Terrorist Attacks

Velentzas's and Siddiqui's teaching and learning how to build a bomb for use in a terrorist attack did not take place in a vacuum. To the contrary, their criminal conduct was shaped by their commitment to radical jihadism and admiration of prior deadly terrorist attacks.

For example, in 2013, Velentzas told the UC that a suicide bomber does not take her life but instead gives her life in the name of Allah. Also in 2013, Velentzas praised the September 11 terrorist attacks and stated that being a martyr through a suicide attack guarantees entrance into heaven. Velentzas also repeatedly informed the UC that Usama bin Laden and his mentor, Abdullah Azzam, are her heroes, that terrorism is based on Islamic writings found in the Qur'an, and that bin Laden's ideas, as manifested in his public letters, are similar to her own. Indeed, in 2013 Velentzas's cellular phone's background photo was an image of bin Laden holding an AK-47 gun. Velentzas also had a picture on her cellular phone of Yahya Ayyash, a bomb-maker known for building bombs used in a number of Hamas suicide attacks. Also in 2013, Velentzas played for the UC an audiotape of bin Laden speaking. See Stipulated Facts ¶¶ 7-10.

Siddiqui, Velentzas's trusted partner in her bomb-making education, was also a committed believer in radical, violent jihadism. Indeed, this served as one of their strongest bonds. In approximately 2006, Siddiqui became close with Samir Khan, an individual who became a prominent figure of Al Qaida in the Arabian Peninsula ("AQAP"), a designated foreign terrorist organization. While living in the United States, Khan ran a blog called "InshallahShaheed" ("Martyr, God willing") and later became the editor of Inspire magazine. Inspire magazine was a magazine through which AQAP disseminated propaganda and actively tried to recruit Muslims throughout the world – including in the United States – to join cause with AQAP. Khan wrote and published several works regarding making homemade bombs and suicide bombing and called for attacks on the United States.

In or about 2009, Siddiqui wrote two poems and an article that she submitted to Khan and that were published in a magazine called Jihad Recollections, a predecessor publication of Inspire. See PSR ¶¶ 8, 9.

It is in this context, steeped in her own and Siddiqui's glorification of violent extremist terrorism, that Velentzas sought to learn to build a bomb and to use it.

2

B. <u>Velentzas and Siddiqui Taught Themselves How to Build Explosive Devices</u>

Beginning in 2013, Velentzas and Siddiqui began meeting with each other and the UC on a regular basis, and discussed how to build an explosive device they could detonate on American soil. For example, on or about August 6, 2014, Velentzas and Siddiqui met with the UC and discussed learning "science" in order to construct an explosive device. Velentzas asked Siddiqui and the UC, "how about science?" When the UC asked Velentzas to clarify what she meant, Velentzas motioned with her hands to simulate the explosion of a bomb. Velentzas said that even if she and Siddiqui understood science, making a bomb was not easy, and noted that many mujahideen (an Arabic word typically referring to individuals engaged in violent jihad, such as members of Al Qaeda or ISIS) have lost fingers or limbs when things have gone wrong making explosives. Stipulated Facts ¶ 12.

On or about September 1, 2014, Velentzas, Siddiqui and the UC met at a park to review course books provided by Siddiqui from an electricity course she had taken. Siddiqui showed the others a passage on electrolytic capacitors and pointed to a sentence reflecting that connecting positive wires to negative receivers and negative wires to positive receivers can cause a fire or explosion. Velentzas questioned how to cause an explosion in this way without hurting themselves, unless they intended to do so—a reference to suicide bombing. Velentzas and Siddiqui implied that their goal was to learn how to blow up a bomb from afar rather than conduct a suicide bombing. See PSR ¶ 18. Specifically, Velentzas suggested that they needed to learn how the science behind explosives worked so that they would not be like Faizal Shahzad and have a failed attempt at detonation.[2] Id.; Stipulated Facts ¶ 15.

Shortly thereafter, on September 7, 2014, Velentzas, Siddiqui and the UC met and discussed the basics of electricity and its potential use in making an explosive device. For several hours, Velentzas explained her notes on one of Siddiqui's electrical work booklets. In this context, Velentzas gave examples including the 1993 World Trade Center bombing, homemade grenades, pressure cooker bombs and pipe bombs. Velentzas explained that each of the bombing examples needed something to activate the bomb from a distance. Velentzas instructed the group that these were good things to know for the sake of Allah in case anybody decided to mess with them and make them feel uncomfortable because they are Muslims. PSR ¶ 19; Stipulated Facts ¶ 16.

Over the next eight months, until their arrest in April 2015, Velentzas and Siddiqui conducted research on explosive devices used in these and other terrorist attacks and taught each other the steps in constructing such devices, all with the intention of using an

---

[2] Faizal Shahzad was the individual who committed the attempted Times Square car bombing. In 2010, Shahzad drove a Nissan Pathfinder, loaded with improvised explosive and incendiary devices to Times Square. He attempted to detonate these devices, but they failed to explode.

3

explosive device in an attack. In addition to planning with Siddiqui, Velentzas took independent steps to learn how to build an explosive device. These include the following:

- On or about November 2, 2014, Velentzas discussed various means of creating explosions, including by using pressure cookers. Stipulated Facts ¶ 19.

- On November 20, 2014, Velentzas asked the UC to read Inspire magazine because it contained useful information about a car bomb explosive, and also requested that the UC download a copy of Inspire magazine on her cellphone. PSR ¶ 20. During that same conversation, Velentzas also stated that what the "white guy" did was easy, a reference to the 1995 Oklahoma City bombing by Timothy McVeigh and Terry Nichols that killed hundreds of people. Id.

- On November 23, 2014, Velentzas discussed portions of The Anarchist Cookbook, an open source guerrilla warfare manual that included instructions on how to build explosive and incendiary devices. Velentzas talked about a page on fertilizer bombs and noted how it was similar to the bomb that detonated during the Oklahoma City terrorist attack. PSR ¶ 20.

- On December 24, 2014, Velentzas and the UC discussed what would be the most practical way to build an explosive. Velentzas suggested that a viable way would be to build a nitroglycerin bomb. Several days later, Velentzas, Siddiqui and the UC met and discussed the steps and chemicals needed to make an explosive device. PSR ¶ 21.

- On February 3, 2015, Velentzas met with the UC at Velentzas's residence. During that meeting, Velentzas noted her study of chemistry, that certain elements were highly reactive, and that aluminum "gives your shit wings, that's how reactive it is." PSR ¶ 21.

- Velentzas viewed a YouTube tutorial for soldering wires and circuit boards. Velentzas also asked another person to buy flux (a smoldering material) for her. In addition, Velentzas studied and took notes from The Anarchist Cookbook, including a section related to the use of nitroglycerin. She also studied electricity and the use of explosives on various websites that she downloaded on her cellular phone. PSR ¶¶ 22-23. Further, Velentzas reviewed articles regarding Miracle Gro, a fertilizer, showed the UC a bag of Miracle Gro, and explained how the bag contained potassium, magnesium, and ammonium nitrate—chemicals used in the Oklahoma City Bombing. Stipulated Facts at ¶ 33(g)-33(h).

Velentzas learned this information so that she and Siddiqui could build and detonate an explosive device. Indeed, Velentzas participated in several meetings where the plans for this information were discussed. For example:

- As set forth above, in September 2014, Velentzas suggested that she and Siddiqui, together with the UC, needed to learn how the science behind explosives worked so that they would not "be like Faizal Shahzad," where "he had a whole car ... ready to go ... and that shit didn't blow up." PSR ¶ 18.

- On November 20, 2014, the same day she claimed that the Oklahoma City bombing was easy, Velentzas showed the UC a video of ISIS members beheading Syrian soldiers and noted the "professional" way ISIS conducted the beheadings. Velentzas also explained that "Jarurah," an Islamist term meaning "paradise," lies through the flesh of the "kuffar," a term meaning "nonbelievers" or "infidels." Velentzas then stated that her main purpose in the United States was to spread Islam and give "dawah," a term meaning "proselytize." According to Velentzas, it was the right of a Muslim to learn how to protect herself while trying to spread the truth. PSR ¶ 20.

- On December 27, 2014, Velentzas, Siddiqui and the UC met at Velentzas's residence to discuss the steps and chemicals needed to make an explosive device. PSR ¶ 21. Velentzas explained that "nitric acid is important for making nitroglycerine" and that "crystals" from a certain process are "explosive." She then added that the size of the explosion depends on various factors, such as the container, its contents, and how the container is lit. Stipulated Facts ¶ 27.

- On February 3, 2015, Velentzas asked the UC whether the UC had listened to a lecture by former al Qaeda leader Anwar al-Awlaki[3], and explained that it was now "the last war, the big war ... before [the] end of days ... [I]n English they call it Armageddon, we're actually living in that time, it's not a joke it starts in Syria." PSR ¶ 21.

- On or about February 22, 2015, Velentzas, Siddiqui and the UC discussed a news story about women traveling to join ISIS in Syria. When the UC indicated that they would not be able to join and support ISIS in Syria, Velentzas responded, "You never know, there's other ways … There's other ways to do that." PSR ¶ 22.

- Velentzas, Siddiqui, and the UC also went to Home Depot and looked at copper wires, paint containers, metal pipes, sodium chloride, and heater fluid. PSR ¶ 23.

---

[3] Before his death in 2011, al-Awlaki was an influential American-born Islamic lecturer who espoused violent jihad against Westerners and encouraged the emigration of foreign fighters to lands around the world where Muslims were perceived to be under attack.

5

  C. <u>Velentzas and Siddiqui Discussed Law Enforcement as Targets for an Attack</u>

  Throughout the meetings between themselves and the UC, Velentzas and Siddiqui discussed viable targets for a terrorist attack, expressing a distinct preference for law enforcement targets over civilian targets. For example, in August 2014, Velentzas criticized the attempted bombing of the Herald Square subway station in Manhattan because the victims would have been "just regular people." Stipulated Facts ¶ 13. Velentzas also stated that the Boston Marathon bombers had erred in attacking regular people because "the people were just running in sports." Stipulated Facts ¶ 25. Instead, Velentzas favored attacking law enforcement, as evidenced by, among other things, her praise for Mohammed Shnewer, who was convicted of plotting a terrorist attack against members of the armed services on a military base. Specifically, Velentzas stated that Shnewer was "charged with quite an admirable thing … conspiring to attack Fort Dix in New Jersey." PSR ¶ 16.

  Indeed, Velentzas repeatedly expressed a desire to commit acts of violence against law enforcement officials. In June 2014, she stated that if the police ever tried to arrest her, she would get ahold of "one of their weapons [and] shoot them." PSR ¶ 15. She also stated that the police "would probably kill us but we will be martyrs automatically and receive Allah's blessings." Id. On December 21, 2014, Velentzas and the UC discussed the recent murder of two New York City Police Department ("NYPD") officers in Brooklyn. Velentzas stated that the murder showed it was easy to kill a police officer. PSR ¶ 16. That same day, in response to the UC noting that there had been more than 25,000 police officers together in one place at the funeral for Police Officer Rafael Ramos, Velentzas complimented the UC on coming up with an attractive potential target. Stipulated Facts ¶ 28. Velentzas then asked the UC several times whether there were any "regular people" (i.e., civilians) at the funeral and how far away they were from the police during the funeral. PSR ¶ 16.

  Three days later, while Velentzas was reading aloud from the Spring 2014 issue of the jihadist propaganda magazine <u>Inspire</u> and, specifically, from a piece titled "Car Bombs Inside America," the UC raised the Boston Marathon Bombing. Velentzas then read aloud from the magazine: "Choosing a place and time is a crucial factor for success in any operation. Even if the enemy … within, you will point us in general and specific targets. America, he said. Britain, France. To the field target of the kind of bomb you have … regarding the individual … event, election, campaign, festival." Velentzas then commented "See that's where Al-Qaida fucked up though like, they always pick, they always, they encourage people to pick these random places. So then you got the guy that did the thing in Boston, and the world was like, what the hell is up with that, because the people were just running in sports. You know?" The UC responded "if you wanna kill a snake you, you try to go for the head, not the, you know, not the tail." Velentzas then said "Exactly. I still believe that. The head. You go for the head, the neck, the shoulders, but not the tail." PSR ¶¶ 24-25.

6

D.  Arrest, Indictment and Guilty Plea

Velentzas was arrested on April 2, 2015. The same day, law enforcement executed a search warrant at Velentzas's and Siddiqui's respective residences. During the search of Velentzas's residence, officers recovered a container of flux, a pressure cooker pot, a bag of fertilizer and various jihadist literature, along with a machete and two knives. PSR ¶ 24. During the search of Siddiqui's residence, officers recovered several items, including, the Inspire magazine article "Car Bombs Inside America," and three 400 gram propane gas tanks. Id.

Velentzas and Siddqui were subsequently charged in an indictment with conspiring to use a weapon of mass destruction against persons and property within the United States, in violation of Title 18, United States Code, Section 2332a(a)(2), teaching and distributing information pertaining to the making and use of an explosive, destructive device and weapon of mass destruction, in violation of Title 18, United States Code, Section 842(p). On August 23, 2019, Velentzas pleaded guilty pursuant to a plea agreement to teaching and distributing information pertaining to the making and use of an explosive, destructive device, and weapon of mass destruction, intending that it be used to commit a crime of violence, in violation of 18 U.S.C. §§ 842(p)(2)(A) and 844(a)(2). See PSR ¶¶ 1, 26, 29.

II.  Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." United States v. Aldeen, 792 F.3d 247, 251-252 (2d Cir. 2015), as amended (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history
> and characteristics of the defendant;

7

      (2) the need for the sentence imposed –

      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B) to afford adequate deterrence to criminal conduct; [and]

      (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

      At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

      Thus, the Court must first calculate the correct Guidelines range. To the extent there remain any open issues as to the correct Guidelines range, the Court should make any necessary finding to arrive at the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case. To that end, the Court must then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

### III.    The Advisory Guidelines Sentencing Range

#### A.    The PSR's Guidelines Sentencing Range

      In the PSR, the Probation Department calculated Velentzas's advisory Guidelines sentencing range as follows:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2 K1.3(c), 2X1.1, 2K1.4(c), 2A1.5) | | 33 |
| Plus: | Terrorism Enhancement (§ 3A1.4(a)) | +12 |
| Less: | Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| Less: | Timely Acceptance of Responsibility (§ 3E1.1(b)) | -1 |

8

    Total Offense Level      <u>42</u>

PSR ¶¶ 34-43. The Probation Department also correctly notes that the government and Velentzas agreed to an additional one-level reduction, pursuant to U.S.S.G. § 5K1.1, for global disposition of the case, yielding a total offense level of 41.

Despite her lack of criminal history, the Probation Department likewise correctly determined that Velentzas's criminal history category is VI because the offense involved, or was intended to promote, a federal crime of terrorism. See U.S.S.G. § 3A1.4(b). Thus, Velentzas's advisory Guidelines range is 360 months to life imprisonment. PSR ¶ 72. However, because the count of conviction has a statutory maximum sentence of 20 years, Velentzas's effective Guidelines range is 240 months' imprisonment. Id.

    B.    <u>A Base Offense Level of 33 Is Correct Because Velentzas and Her Co-Defendant Intended to Kill People With An Explosive Device</u>

Velentzas has indicated that she disputes the base offense level calculation in the PSR. This is the same objection that was made by defendant Siddiqui, and rejected by the Court at her sentencing. The Court should again reject this objection and find that the base offense level is 33 for Velentzas.

Probation has considered Velentzas's objection and has concluded that a base offense level of 33 is correct. See PSR Addendum. The government agrees that, consistent with the PSR, the base offense level in this case is 33. As with defendant Siddiqui, the government reaches this conclusion based on the following:

1. The Statutory Index directs that Section 2K1.3 of the Guidelines (Unlawful receipt, possession, or transportation of explosive materials; prohibited transactions involving explosive materials) be applied in the first instance.[4] See App'x A to U.S.S.G.

2. Section 2K1.3(a) provides for a base offense level of 18 for anyone convicted under § 842(p)(2). However, Section 2K1.3(c) states that if a defendant is "convicted under 18 U.S.C. § 842(p)(2)" to apply Section 2X1.1 (Attempt, Solicitation or Conspiracy) "in respect to that other offense if the resulting offense level is greater than that determined above." In this case, the "other offense" is the use of weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(2).

3. Section 2X1.1(a) directs the use of the base offense level from the guideline for the substantive offense. Per the Statutory Index to the Guidelines, the use of weapon of mass destruction under § 2332a(a)(2) is analyzed using Sections 2A6.1, 2K1.4

---

[4] Although the Statutory Index directs the use of either Section 2K1.3 or 2M6.1 for a conviction under § 842(p)(2), Section 2M6.1 applies only to activity involving nuclear, biological or chemical weapons. See App. Note 1 to Section 2M6.1.

9

   or 2M6.1.  See App'x A to U.S.S.G.  Neither Sections 2M6.1 nor 2A6.1 apply to these facts.[5]  Accordingly, the appropriate starting point for analysis is Section 2K1.4 for "arson [or] property damage by use of explosives."

4. Section 2K1.4(a) provides for a base offense level of 24 if the offense "created a substantial risk of death or bodily injury."  However, Section 2K1.4(c) states that "[i]f death results, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person)" if the resulting offense level is greater (emphasis added).

5. Because Velentzas and Siddiqui made statements reflecting their intent to kill or seriously harm people with their bomb, Section 2A1.5 (Conspiracy or Solicitation to Commit Murder) should be applied, which leads to a base offense level of 33.  See U.S.S.G. § 2A1.5(a).

Velentzas claims that the applicable Guideline reference is U.S.S.G. § 2K1.4(a)(2) and that the appropriate base offense level is 20 "because there was never any explosive obtained or created for the purposes of causing any serious bodily injury to anyone, and because there was no plan to detonate an explosive against any specific target."  Def.'s Objections to PSR ("Def's PSR Letter") at 3.

Velentzas is wrong.  As noted above, this Court already rejected the nearly identical argument by Siddiqui at her sentencing.  See Siddiqui Sent. Tr. at 24.  As noted above, the Guidelines direct the application of "the most analogous guideline" to the relevant offense—here the use of a weapon of mass destruction.  Velentzas and Siddiqui researched explosives for the purpose of using a weapon of mass destruction, and they both repeatedly compared their plans to other terrorist attacks that caused scores of murders.  There is no question that the guideline for conspiring to commit murder is the most analogous given these facts.

Murder is "the unlawful killing of a human being with malice aforethought," 18 U.S.C. § 1111(a), meaning that there must be an intent to kill another person.  Velentzas had that intent.  She did not research how to build a bomb because she was generally interested in how bombs work.  She has admitted, pursuant to her guilty plea, that she was studying how to make an explosive device "with the intent that…[the device] be used for, or in furtherance of, an activity that constitutes a Federal crime of violence."  18 U.S.C. § 842(p)(2)(A).  Since a crime of violence is an offense that includes the "use of physical force against the person or property of another," at a bare minimum Velentzas's intent was that an explosive device would

---

[5] As previously noted, Section 2M6.1 only applies to activity involving nuclear, biological or chemical weapons.  Section 2A6.1 involves "threatening or harassing communications," which is not supported by the facts of this case.

10

be detonated against a person or property. Given the nature of how an explosive device is used, the likelihood of killing someone is already significant.

The stipulated facts in this case confirm that Velentzas intended for any bomb she and Siddiqui made to kill people. This is demonstrated by, among other things, Velentzas's and Siddiqui's relentless focus on prior terrorist attacks and jihadist propaganda that promoted the use of explosives to kill people, as well as by Velentzas's repeatedly expressed admiration and advocating for the targeting of law enforcement personnel. As set forth above, on the same day Velentzas described as "easy" the 1995 Oklahoma City bombing that killed hundreds of people, she praised the professionalism of ISIS soldiers beheading Syrian soldiers. She and Siddiqui studied how to make and planned to build a bomb during the same time period they were repeatedly discussing past terrorist bombings. Velentzas praised the September 11 terror attacks, the man who conspired to attack U.S. soldiers at Fort Dix, and Usama bin Laden, whom she revered as a hero. Her own cell phone background was an image of bin Laden with an AK-47 rifile, and she also had on her phone a photograph celebrated a Hamas bomb maker responsible numerous civilian deaths. Velentzas and Siddiqui were not learning and planning to build a bomb for no reason, and Velentzas has left no doubt as to her intent; it was to commit a terrorist attack.

Accordingly, the preponderance of the evidence in this case clearly supports the conclusion that Velentzas intended to commit murder with the explosive devices that she was studying to build, and the most analogous guideline is Section 2A1.5 (Conspiracy or Solicitation to Commit Murder), which provides for a base offense level of 33.

C. The Terrorism Enhancement Is Correctly Applied

Velentzas also disputes the application of the terrorism enhancement. See Def.'s PSR Letter at 4. Probation has considered this objection and concluded that the terrorism enhancement should apply. See PSR Addendum. Likewise, this Court has already correctly found the terrorism enhancement applicable to Velentzas's co-defendant. See Siddiqui Sent. Tr. at 24. It applies equally here.

The terrorism enhancement under Section 3A1.4 applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." A "federal crime of terrorism" is a crime that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of one or more enumerated federal statutes. See 18 U.S.C. § 2332b(g)(5).

For the purposes of applying the enhancement, the offense of conviction need not be on the enumerated list in Section 2332b because the enhancement applies both to crimes that "involved," or were also "intended to promote," a federal crime of terrorism. See, e.g., United States v. Awan, 607 F.3d 306 (2d Cir. 2010) (reversing district court decision not to apply enhancement to defendant convicted of conspiracy to provide material support to conspiracy to commit murder, kidnapping and maiming, and holding that the phrase "intended to promote" in Section 3A1.4 "must be

>  applicable…where the defendant's offense or relevant conduct does <u>not</u> include a federal crime of terrorism) (emphasis in original).

Velentzas argues that she "did not have the specific intent to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" Def.'s PSR Letter at 4 (quoting 18 U.S.C. § 2332b(g)(5)(A)). Velentzas is wrong and, indeed, the Court already rejected the nearly identical argument from Siddiqui, who herself attempted to shift the intent to commit a terrorist attack onto Velentzas.

The facts clearly support the conclusion that Velentzas's and Siddiqui's conduct here was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." "The conventional meaning of 'calculated' is 'devised with forethought'" and, therefore, "if a defendant's purpose in committing an offense is to 'influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' the first requirement of section 2332b(g)(5)(A) is satisfied." <u>United States v. Stewart</u>, 590 F.3d 93, 137 (2d Cir. 2009). As reflected in more detail in the Stipulated Facts, the following is proof that the defendants' conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct":

1. The overarching decision by Velentzas and Siddiqui to research and obtain materials for explosives similar to various historically significant terrorist attacks, including the World Trade Center bombing, the Boston Marathon bombing, the failed Times Square bombing and the Oklahoma City bombing. All of these attacks were calculated to influence or affect the conduct of the government, and the fact that Velentzas and Siddiqui were modeling their own plans after these attacks means that they had the same intent.

2. Velentzas's and Siddiqui's stated belief in the propriety and righteousness of suicide attacks. Velentzas claimed Usama bin Laden as a hero, praised the attacks of September 11, 2001, and stated that being a martyr through a suicide attack guarantees entrance into heaven. Velentzas also described viewing a video of a suicide bombing in Syria or Iraq and said it was "cool." Siddiqui wrote posts for Samir Khan's magazine praising violent jihad and wrote in support of attempted vehicle-born improvised explosive device defendant Mohammad Mohamud. Their statements of support and favor for politically motivated violence further shows their intent.

3. Velentzas' praise for an "admirable" attempted terrorist attack on Fort Dix, New Jersey.

4. Velentzas' statement, in the context of various terrorist attacks that killed civilians, that it would be better to attack "the head, the neck, the shoulders" of the "snake," an obvious reference to directly attacking the government, rather than civilians.

12

5. Both Velentzas's and Siddiqui's association with, and idolization of, various terrorist figures including Samir Khan, Abdullah Azzam, Usama Bin Ladin and Yahya Ayyash, all of whom engaged in crimes unambiguously calculated to influence or affect the conduct of government by intimidation or coercion.

6. Both Velentzas's and Siddiqui's review of car bomb instructions in Inspire magazine, a propaganda magazine for a foreign terrorist organization that has engaged in numerous criminal acts that have been calculated to influence or affect the conduct of government

7. Velentzas's September 2014 discussion discussed with Siddiqui about the 1993 World Trade Center bombing in the context of discussing how to detonate a bomb from a distance.

Accordingly, the facts here overwhelmingly support the application of the terrorism enhancement to Velentzas and the Court should apply it, just as it did with her co-defendant.

IV. The Section 3553(a) Factors

"The nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and "the seriousness of the offense," id. § 3553(a)(2)(A), alone merit a sentence of 240 months' imprisonment, which is the effective Guidelines range. Velentzas and Siddiqui taught each other chemistry and electrical skills directly related to creating explosives and building detonating devices, discussed similar devices used in past terrorist incidents like the Boston Marathon bombing, and researched potential targets of an attack, such as law enforcement. These type of attacks would have been catastrophic had they been carried out as intended. Thus, the seriousness of Velentzas's conduct and the need for a significant sentence is sufficiently met here. Indeed, this Court's imposition of a fifteen-year sentence on Siddiqui for the same offense reflects the gravity of the conduct.

A sentence of 240 months' imprisonment in this case is also necessary "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Indeed, the need for deterrence is especially important in the context of a terrorism offense. Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult. See, e.g., United States v. Meskini, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). As Second Circuit Judge John M. Walker has stated, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." United States v. Stewart, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring). In this case, there is a strong demand for both individual and general deterrence.

With respect to individual deterrence, Velentzas has demonstrated a commitment to promoting and waging violent jihad and to targeting law enforcement officers for attack, both in her words and in her actions. Indeed, as set forth above and throughout the

13

Stipulated Facts, Velentzas demonstrated in repeated statements and actions during the charged period her desire to build a bomb and then target law enforcement. Throughout this period, Velentzas espoused and was motivated by a poisonous admiration for prior terrorist attacks and their perpetrators, and consistently took action, along with Siddiqui, to learn the skills necessary to build a bomb with the intent to complete an attack of their own.

Further, as this Court emphasized at Siddiqui's sentencing, any attempt to suggest that Velentzas and Siddiqui sought to build a bomb for "self-defense" or was merely part of an attempt to protect their faith is preposterous and must be rejected. This claim contradicts the overwhelming evidence and defies reason. Bombs are not defensive weapons. Indeed, the terrorist bombings that Velentzas and Siddiqui admired and modeled for comparison to their own bomb-making studies were *not defensive bombings*. Usama bin Laden, Velentzas's hero, was not a defensive bomber. And while it is true that their conversations sometimes reflected a preference for avoiding civilian casualties, neither Velentzas nor Siddiqui expressed any such sentiment for members of law enforcement and the military, whom Velentzas clearly viewed as legitimate targets for an explosive attack. This is exactly what Velentzas meant when she praised Mohammed Shnewer's plot to attack Fort Dix as "an admirable thing," PSR ¶ 16, and when encouraged the targeting of police officers for an attack. Stipulated Facts ¶ 28. Velentzas's willingness to turn her words into action is clear.

Velentzas's veneration of Yahya Ayyash, the Hamas bomb-maker, is likewise chilling and telling, and is further evidence of her intent behind learning to build a bomb. Also known as "the Engineer," Ayyash was Hamas's chief bomb-maker until his death in 1996. Prior to that, he built bombs used in numerous suicide attacks that killed at least 60 people and injured hundreds. In the Velentzas's and Siddiqui's warped view of Islam, their work learning and planning to build and use an explosive device was like that of Ayyash; when they perceived themselves or other Muslims under attack, striking back with a bomb was a form of "self-defense." That is terrorism, not a defensive action.

Finally, this is a case where general deterrence also demands the Guidelines sentence. Given the gravity of the offense and the potential catastrophic damage that might have occurred had Velentzas and Siddiqui achieved their aim of detonating a bomb like the attacks they idealized, this Court should make clear to anyone contemplating similar actions that such an offense will be punished severely.

V.   Conclusion

In short, the need for punishment for Velentzas's offense, the need for specific as well as general deterrence and the need to protect the public calls for a significant sentence.

The government thus respectfully requests that the Court impose a sentence of 240 months' imprisonment.

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney

                          By:   /s/ Josh Hafetz
                                        Josh Hafetz
                                        Craig R. Heeren
                                        Jonathan E. Algor
                                        Assistant U.S. Attorney
                                        (718) 254-7000

cc:     Defense counsel (by ECF)
         USPO Shayna Bryant (by email)