IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | \| | |
| | \| | 15 Cr. 213 (SJ) |
| | \| | |
| v. | \| | The Hon. Sterling Johnson |
| | \| | |
| NOELLE VELENTZAS, | \| | |
| | \| | |
| Defendant. | \| | |

---

**DEFENDANT NOELLE VELENTZAS' SENTENCING MEMORANDUM**


SEAN M. MAHER
*Counsel for Noelle Velentzas*

The Law Offices of Sean M. Maher, PLLC
233 Broadway, Suite 820
New York, NY 10279
(212) 661-5333
(347) 548-9959 fax
smaher@seanmaherlaw.com

## TABLE OF CONTENTS

Table of Authorities .................................................................................................................. ii

Introduction ............................................................................................................................. 1

1.    The unique history and circumstances of Noelle Velentzas reveal a bright, creative, and resilient woman who survived years of trauma, abuse, and homelessness after the tragic death of her father.   …………………………………………2

2.    While serious, the nature of the offense includes a host of mitigating factors. …………9

      A.    There never was any actual plan to attack any person or target.  ………………..9

      B.    There never was any construction of any explosive device.  ……………………9

      C.    Ms. Siddiqui and Ms. Velentzas had equivalent levels of culpability in regard to Count Two.  …………………………………………10

      D.    The recordings made by the UC of Ms. Velentzas' conversations confirm that Ms. Velentzas lived in abject poverty, suffered abuse, and felt some need for physical protection.  ……………………………………11

3.    Objections to the Presentence Report  ………………………………………………..…14

4.    The Court should decline to adopt the Sentencing Guideline analysis set forth in the PSR.  ……………………………………………………………14

5.    Along with other 3553(a) factors, Ms. Velentzas' positive behavior while detained for almost the last five years at the MDC weigh strongly in favor of a sentence lower than 180 months.  ……………………………………………15

Conclusion .............................................................................................................................. 19

# TABLE OF AUTHORITIES

## STATUTES

18 U.S.C. § 921(a)(4)..................................................................................................10

18 U.S.C. § 2332a(c)(2).............................................................................................10

18 U.S.C. § 2332b(g)(5)(A)........................................................................................15

18 U.S.C. § 3553(a) ...........................................................................................*passim*

## U.S. SENTENCING COMMISSION GUIDELINES

U.S.S.G. § 2A1.5(a) ..................................................................................................14

U.S.S.G. § 2K1.4(a)(1) .............................................................................................14

U.S.S.G. § 2K1.4(a)(2) ........................................................................................14, 15

U.S.S.G. § 2X1.1 ......................................................................................................14

U.S.S.G. § 3A1.4(a) .............................................................................................14, 15

**Introduction**

How does a young girl who was born 32 years ago in Plainview, New York come to the point where, as an adult, she agrees with an undercover police officer and a friend to learn how to make an explosive device?   There is no simple answer.   The search for understanding who Noelle Velentzas is and what she did, however, leads to one inexorable conclusion: sentencing Ms. Velentzas to anything close to 20 years' imprisonment would be a travesty of justice.

The World Health Organization (WHO) notes that there are four different kinds of child maltreatment: physical abuse, sexual abuse, emotional or psychological abuse, and neglect.[1] During her childhood and teenage years, Noelle was subjected to all four types of maltreatment. Noelle is an intelligent, artistic, and compassionate woman who never deserved the years of trauma she has had to endure.   When Noelle met the undercover officer in this case, Noelle was living in abject poverty and was a hair's breadth from homelessness.   While being detained at the MDC for almost the last five years, Noelle has devoted her time to providing positive support for other women overcoming their own hardships.   Throughout her detention, Noelle has not committed a single disciplinary infraction.

Noelle Velentzas now stands before the Court because she broke the law as reflected in Count Two of the indictment.[2]   She has admitted her guilt and accepted responsibility for her actions.   The question before the Court is: what is a sentence that is sufficient but not greater

---

1  https://www.who.int/news-room/fact-sheets/detail/child-maltreatment
2  Attached to this letter are 16 exhibits labeled 1-16.   Sensitive personal information is redacted from this publicly-filed submission and the attached exhibits.   It is requested that Exhibits 11, 14, and 15 be filed under seal.

than necessary for Ms. Velentzas?

## 1.   The unique history and circumstances of Noelle Velentzas reveal a bright, creative, and resilient woman who survived years of trauma, abuse, and homelessness after the tragic death of her father.

When she was just under 4 years old, Noelle lost her dad 33-year-old dad, Alex Velentzas, who died in 1991 from complications stemming from AIDS.   Alex, a computer technician, became HIV positive before Noelle was born and was symptomatic of AIDS, but didn't know he had HIV for a long time.

Though she was young when her dad passed away, Noelle still remembers her dad – his kindness, warmth, and curiosity.[3]   She remembers that her dad liked to watch CNN, that he fixed computers, and that he was always joking around and laughing, despite his declining health.

Noelle remembers her dad's terminal illness – becoming wheelchair-bound, losing his bodily functions, and slowly dying while still trying to maintain the spirits of his daughter and wife.   She remembers how her dad was emaciated and how people were mean to him because of their fear of AIDS, yet he would take time to talk to sick people in the hospital to try and lift their spirits.

Noelle's mother, Nadine Stefanelli, loved Alex, and he loved her.   In Noelle's words, "Dad and Mom were in love. Artsy people. Soul mates."[4]

As Alex's health deteriorated, Nadine and Alex decided to move to Florida.   At that time

---

3 *See* Exhibit 10 (photographs of Noelle and her family members, including her dad).
4 Unless otherwise indicated, quotations attributable to Ms. Velentzas are direct statements made during her presentence interview.

New York was not very wheelchair accessible and they wanted to be in a nice place before Alex died.   Nadine and Alex thought Florida would be a good place to live; wheelchair accessibility would be increased and Nadine hoped that she could make ends meet with cheaper housing costs.   An artist by vocation, Nadine was not able to generate a living wage through her art work and hoped to find a job in Florida.   So Nadine helped pack everyone and everything up, and they moved to Ft. Lauderdale, Florida.

Within months of moving to Florida, Alex passed away.   The death of Noelle's dad set off catastrophic repercussions that ripple through the present day.

With the death of Alex, Nadine was left as a single mother with serious medical issues and a tenuous financial situation.   Nadine had to rely upon government assistance, food stamps, minimum wage jobs, and substandard housing to support herself and Noelle.   Even worse than becoming destitute, Noelle was left without a loving uplifting father.

In 1987, the same year that Noelle was born, Nadine suffered a debilitating injury to her back in a car crash.   In 1995 Nadine herniated a disk and exacerbated her pre-existing back injury. Throughout Noelle's childhood, Nadine regularly needed pain management for her back and had great difficulty holding down a job because of her back pain and medicated state.

After the death of Noelle's dad, Nadine began dating.   As recounted by Nadine, Noelle "didn't take a liking to the other men" that Nadine dated.[5]

Noelle remembers moving to all sorts of different places because her mother did not have a home for them to live in.   The first place Noelle remembers moving to after the death of her

---

[5] Unless otherwise indicated, quotations attributable to Nadine Stefanelli are from discussions with undersigned counsel.

3

dad was into a mobile home of a man named Carl.   Noelle remembers that Carl drank a lot and that there were always green glass bottles all over the trailer.   While living in Carl's trailer, Noelle developed a pronounced pinworm infection that she remembers to this day.

After living in Carl's trailer for a while, Nadine still could not afford an apartment, so she and Noelle bounced around between a whole bunch of places.   They stayed with an aunt and then various friends of Nadine.

When Noelle was around 8 years old, Nadine married a widower whose wife and child recently had died in a car accident.   Nadine and Noelle moved into Nadine's new husband's house.   Noelle lived in the same household with Nadine's husband and his one surviving daughter until Noelle was about 14 or 15 years old.

Noelle vividly remembers that her stepfather had "a lot of anger."   Her stepfather would say things to Noelle and her mother like "you are an asshole."   According to Noelle, her stepfather "beat the shit out of" his own daughter.   The stepfather choked, hit, and verbally abused Nadine.   Noelle remembers that her stepfather hit Noelle "a lot of times" for saying "don't hit Mom."   Her stepfather also would slap Noelle for things such as leaving dishes in the sink.   If someone had a bad dream, her stepfather would beat them.

Noelle did not feel safe in her own home and felt that her stepfather worsened her mother's health problems.   By the time Noelle was 13 years old, her mom not only had the serious back injury, but also she had developed neuropathy and was diagnosed as having bipolar depression and anxiety.

While fully aware of her stepfather's brutality and dangerousness, Noelle also recognized his positive qualities.   He could be, in Noelle's words, "nice;" he could be "philosophical."

4

Nadine and her husband had a tile business together where Nadine would come up with the design plans and her husband would install the tile.

But the bad far outweighed the good.   Noelle remembers that she would tell her stepfather that he should just leave her mother.   Eventually, after about 7 years, Nadine left her husband, taking Noelle with her, and they moved into a hurricane-damaged apartment in a depressed neighborhood.

That was not the only relationship that Nadine had after the death of Alex.   By Noelle's count, she has "called four different men" her father, but "none have been as good as" her real father.

Noelle remembers having serious feelings of anxiety as early as kindergarten.   Because of the death of her father, Noelle start getting into trouble at school.   She began seeing a counselor and was put on medication that made her fall asleep.   This was also a time when Noelle remembers that she and her mom were moving between different apartments and peoples' homes in Florida, before her stepfather was in the picture.

When Noelle was around six, she was walking home by the park when a man pulled up in car next to her, got out, and started following her.   Noelle was close to home and walked faster; she heard the man walk faster.   She began running and saw the man running after her.   She tried to yell, but nothing came out as she was running.   Noelle made it to the apartment before the man caught her; she immediately threw up.   When Noelle told her mom what had just happened, her mother brushed it off, saying that Noelle probably just misunderstood what was going on.

Noelle remembers that once while in daycare the adult in the room grabbed Noelle, and

5

then pushed and locked Noelle in the cleaning closet – the closet with bleach and other chemicals.   Nadine did report this incident and Noelle remembers being interviewed about it, but as far as she knows, nothing ever happened to the adult who did this to her.

As a young student, Noelle showed tremendous academic potential.   In second grade she tested into gifted placement and after receiving a total IQ score of 132 on the WISC-III (Weschler Intelligence Scale for Children – Third Edition) and of 138 on the SIT (Slosson Intelligence Test).[6]   Noelle also was a talented artist.[7]

Despite her academic promise, by fifth grade Noelle was seriously depressed.   Just ten years old, she wanted to kill herself and expressed her suicidal feelings.   A new counselor was given to Noelle, but the underlying daily trauma at home could not be ameliorated.   Noelle felt that she "just didn't belong in the world."   Her dad was dead and she was "living with someone else's family," namely her stepfather's.   She felt helpless and that she "couldn't rest" living under the same tumultuous roof as her stepfather.   This led Noelle to believe that suicide was the only solution that would allow her finally to "rest."   Noelle talked with her teacher and with her new counselor about this, but they were not able to do anything to help her at home.

Not surprising considering what she was living through, Noelle first started drinking alcohol at 9 years old. "Rum, straight from the bottle," recalls Noelle.   If she felt stressed, she drank.   She continued drinking a few times a month until age 12 when "it picked up."   Noelle would brush her teeth to mask the smell of the alcohol and no one at home ever picked up on it.

By age 14, Noelle was drinking weekly or when stressed out and by age 16 she was

---

6 *See* Exhibit 14 (school records – to be filed under seal).
7 *See* Exhibit 12 (paintings of Noelle kept by her mother).

"drinking all the time."   Noelle typically drank a half of a bottle at a time.   At this time in her life Noelle also began smoking marijuana.

At around age 16, Noelle began dating a young man who was several years older than her.   Nadine recalls that Noelle spent less and less time at home.   Looking back now, Nadine thinks that Noelle may have even been homeless during a period of her high school years; Nadine says she doesn't remember for sure.   Noelle was in fact homeless for months during her junior and senior years of high school, living in a car and with different friends.

The PSR notes that Noelle received one school suspension in high school.   Noelle remembers the incident.   Noelle rushed out of a classroom and pushed by an adult who was standing in a doorway.   Why?   Because Noelle was hurrying to get to the cafeteria because she was so hungry.

One night when Noelle was 17, she was with one of her drinking friends at a hookah lounge.   Noelle, who had been drinking, left to go buy some sandwiches and a man who had been with Noelle's friend followed Noelle.   He was "all over" Noelle "to have sex," but Noelle did not want to.   The man touched Noelle and then sexually assaulted her.   After the assault, Noelle threw out her underwear.   She prayed to God to turn alcohol into poison for her.   She then cut out all people in her life who were "pro alcohol."

To help feed herself and her mother, Noelle started working at age 16.   Her first job was at McDonald's.   Noelle gave at least half of the money she earned to her mother to help buy food.

Because Nadine moved around so much, Noelle attended numerous schools, including four different high schools.   In 2006, Noelle graduated high school at age 18 with a 3.19 GPA.

7

Since before high school, Noelle felt an affinity with Islam.   Her family is not Muslim –
she just was drawn to the beauty of the religion.   At age 17, she read the Qur'an and began
fasting.   At age 18 she read the Qur'an again and became a Muslim.   Upon embracing Islam,
Noelle shed her self-destructive behaviors that she had used to soothe her hurting spirit, such as
drinking alcohol, smoking marijuana, and hanging out with people who drank and used drugs.

When Noelle was 19, she met a 27-year-old man, and, after knowing each other for only
a week, they got married.   The marriage lasted two months.   Noelle's husband spoke harshly to
Noelle – he would call her stupid and raise his hand at her.   Noelle gave him one month to stop.
When he didn't stop within a month, Noelle "walked out the door and was homeless again."

Noelle decided that she needed to leave Florida and move back to the Northeast.   She
moved on her own up to New Britain, Connecticut, and slept on the sofa of her friend for several
months.   She then moved to Queens to live with a cousin.   That living situation went downhill
as Noelle found out that her cousin was a heroin addict.   Unable to live with the volatility of her
addict cousin, Noelle had to seek refuge in a women's shelter in Queens, where she lived for
several months, getting by on food stamps.

While living in Queens, Noelle met Antero Devarie, who she knows affectionately as
"Abu."   Noelle and Abu have been together now for over ten years.   Together they have a 10-
year-old daughter.   In the months before her arrest, Noelle opened up her home to Abu's niece
who needed a place to live to avoid being placed in the foster care system.

From 2012 until her arrest in 2015, Noelle worked as a part-time home care attendant for
a company based in Queens.   Before that, Noelle had a number of low-paying jobs, such as
waitressing and babysitting.

8

In the few years before her arrest, Noelle devoted time to raising awareness about the plight of homeless women.   Noelle attended charity fundraisers for the women's shelter that she lived at and was asked to talk about homelessness to those gathered.   As described by her friend Jamuid, Noelle "was always helping those in need and she especially went out of her way to help the handicapped and the elderly.   I can remember on many occasions, her insisting that we prepare food and go feed the homeless."[8]

## 2.    While serious, the nature of the offense includes a host of mitigating factors.

Through motion papers[9] and the sentencing submissions already filed,[10] the Court has been provided many details concerning the nature of the offense.   The entire offense narrative will not be repeated here.   Instead, a few key points are highlighted for the Court's consideration.

### A.    There never was any actual plan to attack any person or target.

The PSR states that no "threats to commit violence were ever aimed at specific individuals or executed by Velentzas."[11]   The Probation Office's assessment of this fundamental fact squares with the reality of the situation.   No plan to attack any person or any target was ever formed, even in response to the incessant goading from the UC to make such a plan.

### B.    There never was any construction of any explosive device.

Neither Ms. Velentzas nor Ms. Siddiqui ever started constructing any type of explosive device.   The three small propane canisters found during the search of Ms. Siddiqui's basement

---

8  Letter of Jamuid Shabazz, attached as Exhibit 7.
9  *See, e.g.,* Doc. Nos. 83, 84, 86, 89, 90, 97, 98, 99, & 100.
10  *See, e.g.*, Doc. Nos. 132, 133, 138, 140, 141, & 149.
11  PSR ¶ 16.

were not a part of any planned explosive device, at least as far as Ms. Velentzas knew.   Ms.

Velentzas had no idea that Ms. Siddiqui had the propane or other materials in her home.   In fact,

Ms. Velentzas was just as surprised as the UC to find out that Ms. Siddiqui had the materials.[12]

That said, the canisters were over ten years old and had been bought by Ms. Siddiqui's relative

for home use.[13]   Each cannister, when new, had a net weight of 14.1 *ounces*.[14]   There is no way

that these tiny old rusty cannisters could be used to build anything resembling a "weapon of mass

destruction" as understood by the general public.[15]

**C.     Ms. Siddiqui and Ms. Velentzas had equivalent levels of culpability in regard to Count Two.**

Contrary to the spin put forth in Ms. Siddiqui's defense, Ms. Siddiqui and Ms. Velentzas

shared equivalent levels of culpability in regard to Count Two.   There were times that the UC

met with Ms. Siddiqui outside the presence of Ms. Velentzas, as well as times the UC met with

Ms. Velentzas outside the presence of Ms. Siddiqui.   As stated in the PSR, "both defendants

were equally culpable in the offense" and both "were co-equal participants in the instant scheme

. . . ."[16]   The government has concurred with the Probation Office by stating that Ms. Siddiqui

and Ms. Velentzas were equally culpable in the offense and that Ms. Siddiqui "equally shared in

---

12 *See* Recorded conversation of Feb. 22, 2015 at 230-31. Hereinafter, transcripts of the recorded conversations with the UC will be denoted as "RCT" followed by the date of the recorded conversation.

13 *See* Doc. No. 133 at 9.

14 *See* Exhibit 13 (photographs of the cannisters).

15 The term "weapon of mass destruction" as set forth in federal law bears no resemblance to what an ordinary reasonable person would consider to be a weapon capable of causing "mass destruction."   A "weapon of mass destruction" as defined in 18 U.S.C. § 2332a(c)(2) and 18 U.S.C. § 921(a)(4) is not necessarily a device that will cause any destruction whatsoever, much less any destruction on a "mass" scale.

16 PSR ¶ 27.

the conduct and planning of the criminal activities."[17]  There is no factual basis for any finding that Ms. Velentzas had any higher level of culpability than Ms. Siddiqui in regard to Count Two.

If anything, Ms. Velentzas had an overall lower level of criminal culpability because Ms. Siddiqui on her own committed a separate criminal offense by lying to federal authorities.[18] Count Three was dismissed against Ms. Siddiqui as a part of the global plea disposition between all the parties, however Ms. Siddiqui's criminal conduct of lying to federal investigators was proffered to the Court by the government and the Probation Office to be considered at Ms. Siddiqui's sentencing.

**D.    The recordings made by the UC of Ms. Velentzas' conversations confirm that Ms. Velentzas lived in abject poverty, suffered abuse, and felt some need for physical protection.**

The government's own recordings of Ms. Velentzas show the dire economic plight of Ms. Velentzas, the abuse Ms. Velentzas has suffered, and Ms. Velentzas' fear of violence being perpetrated against her.

The poverty that Ms. Velentzas experienced as a child and teenager continued up to her arrest.  In her recorded conversations with the UC, Ms. Velentzas discussed how she did not have any money.[19]  During one of the years before her arrest, Ms. Velentzas' yearly income was $4,000.[20]  Ms. Velentzas relied on food stamps[21] and regularly struggled to afford food for herself and her family; sometimes she even had to ask people in line at the store for money.[22]  By

---

17 Gov't. sentencing memorandum concerning Asia Siddiqui at 15-16, Doc. 140, filed 12/24/19.
18 *See id.* at 2-3.
19 RCT July 16, 2014 at 89 (recording Ms. Velentzas saying that she doesn't have any money).
20 RCT Feb. 3, 2015 at 40.
21 RCT Sept. 4, 2014 at 7.
22 RCT March 4, 2015 at 28.

the end of some months after spending all of her money and using all of her food stamps, Ms. Velentzas was dizzy from hunger,[23] a fact noted by the UC who was recorded telling her supervisor how she couldn't get Ms. Velentzas to discuss bombs because Ms. Velentzas is "dizzy" from not eating.[24]   Poverty forced Ms. Velentzas into isolation as well, because she routinely was out of food and money by the end of every month, and, thus, in her words, she had to be "anti-social."[25]

Despite her own poverty, the recorded conversations reveal that Ms. Velentzas is generous with what she does have.   She opened up her home to raise her niece[26] and shared what food she did have with guests.[27]

Ms. Velentzas lived in horrifying housing conditions.   Her landlord refused to supply heat in the winter,[28] routinely leaving her in physical pain.[29]  Her home was infested with roaches[30] and she faced eviction.[31]

On December 3, 2014 the UC was recorded in a conversation with her law enforcement colleague talking about Ms. Velentzas.[32]   In that conversation, the UC admits to trying to steer her conversations with Ms. Velentzas toward criminal activity but that "for some reason, it

---

23 RCT Dec. 3, 2014 at 29
24 *Id.* at 151.
25 *Id.* at 51.
26 *Id.* at 84.
27 RCT Sept. 21, 2014 at 127 (Ms. Velentzas discussing not having food, food stamps, or the next meal in her fridge, but the joy she experiences providing what little food she has to guests).
28 RCT Dec. 3, 2014 at 14; RCT Feb. 3, 2015 at 30.
29 RCT Dec. 3, 2014 at 87.
30 *Id.* at 70; RCT Feb. 3, 2015 at 36.
31 RCT Dec. 4, 2014 at 96-97, 105.
32 RCT Dec. 3, 2014 at 151-158.

doesn't go anywhere."[33]   The UC admits that Ms. Velentzas is far more worried about being

poor and not having food to eat, as reflected in the following passage:

> I go into it thinking like, okay, the conversation needs to go in this
> direction, and it just never works out that way.   Like, I got to just take
> the time – yeah.   And you're dealing with ghetto people who have other
> things to worry about.   Like, she had no food to eat until today.   She got
> her food stamps, you know?   And – yeah.   So, like, today, she was more
> concerned about, you know, she's like I was feeling, you know, like, I
> don't know, she's dizzy and she's like it was really cold in the house.
> Like, she has real-life issues.   It's not – every time I see her, I can't be
> like, oh, yeah, let's talk about making bombs.   That's not how reality
> works.   You know, she's a mom.   She has a husband. She has things to
> deal with.   She was work issues.[34]

As a survivor of sexual assault and other physical violence, Ms. Velentzas was concerned

about her physical safety.   For instance, Ms. Velentzas talked with the UC about how she kept a

knife because she was attacked when she was homeless.[35]   Ms. Velentzas told the UC how she

believed she had PTSD and had been sexually assaulted.[36]   Ms. Velentzas stated that she was

not a violent person, that she wanted peace, and that she enjoyed studying science, but that she

needed to know how to defend herself.[37]

These circumstances are not a defense to the crime for which she has acknowledged her

guilt.   Rather, these circumstances provide context for the Court in understanding the physical

and emotional state that Ms. Velentzas was in during the time period the offense occurred.

---

33 *Id.* at 151.
34 *Id.*
35 RCT July 13, 2014 at 105-06.
36 RCT Oct. 26, 2014 at 139.
37 *Id.* at 165; RCT Feb. 3, 2015 at 74.

### 3.      Objections to the Presentence Report

The defense's specific objections to the PSR were provided to the Probation Office and the government in a timely manner and are attached as Exhibit 15.   In an Addendum to the Presentence Report dated February 26, 2020, the Probation Office rejected all of the objections raised by the defense.   Thus, the defense's objections remain outstanding and are incorporated herein by reference.

### 4.      The Court should decline to adopt the Sentencing Guideline analysis set forth in the PSR.

The defense is cognizant that the Court already sentenced co-defendant Asia Siddiqui after adopting the Probation Office's Guidelines recommendation concerning the total offense level.   That recommendation mirrors that made in the PSR in regard to Ms. Velentzas.   The defense still urges the Court to decline to adopt the Probation Office's recommendation to apply U.S.S.G. § 2A1.5(a) and the U.S.S.G. § 3A1.4 terrorism adjustment.

Ms. Velentzas never conspired to kill anyone in a bomb plot, thus U.S.S.G. § 2X1.1 should not be used to invoke U.S.S.G. § 2A1.5(a); instead U.S.S.G. § 2K1.4(a)(2)(Arson; Property Damage by Use of Explosives) should be used.[38]   U.S.S.G. § 2K1.4(a)(2) is more appropriate than U.S.S.G. § 2K1.4(a)(1) because there was never any explosive obtained or created for the purposes of causing any serious bodily injury to anyone, and because there was no plan to detonate an explosive against any specific target. Thus, the base offense level should be 20.

---

38 *See* Defendant's Objections to the Presentence Investigation Report at 7-10, filed by co-defendant Asia Siddiqui, Doc. 132, filed 12/02/19.

The U.S.S.G. § 3A1.4(a) terrorism adjustment is not applicable.[39]   Ms. Velentzas did not

have the specific intent to commit an offense that was "calculated to influence or affect the

conduct of government by intimidation or coercion, or to retaliate against government

conduct,"[40] thus 12 levels should not be assessed and the criminal history category should

remain I, not VI.

Because the relevant Guideline is U.S.S.G. § 2K1.4(a)(2), the Adjusted Offense Level

should be 20, not 45.   Taking into account the 3 levels that should be subtracted for Ms.

Velentzas' timely acceptance of responsibility and the additional downward 1 level as

recommended in the mutually-agreed plea agreement for Global Disposition, the Total Offense

Level should be 16, not 42.   Because U.S.S.G. § 3A1.4(b) should not be applied, Ms. Velentzas'

criminal history category should be I, not VI, resulting in a Guideline imprisonment range of 21-

27 months.

## 5.   Along with other 3553(a) factors, Ms. Velentzas' positive behavior while detained for almost the last five years at the MDC weigh strongly in favor of a sentence lower than 180 months.

Ms. Velentzas was arrested on April 2, 2015 and has been detained at the MDC

continuously since then.   This is the first time that Ms. Velentzas has ever been arrested or

detained.

Ms. Velentzas' participation in the MDC's programming for women has been nothing

short of exceptional.   The list of all programs and courses that she has been involved in are as

follows:

---

39  *See, e.g., id.* at 10-12.
40  18 U.S.C. § 2332b(g)(5)(A).

15

- The Seeking Safety Course
- 4 Hour Training for Participation in the Suicide Watch Companion Program
- Art Course as Instructor
- Chess Course as Instructor
- Your Future Paycheck
- Introduction to Chess Class
- Effects of Incarceration
- Advanced Chess Class
- Criminal Thinking Group
- Poetic Expressions Class
- Women's Relationship Group
- Art Class
- Cardmaking Class
- Cardio Training Course
- We Fit Program
- Blood Pressure Class
- Leadership Class
- Trauma in Life Workshop
- Health Education Course
- Early Childhood Literacy Workshop
- Studio Art Workshop (Columbia University)
- Resume Writing and Social Media & Reputation Management
- The Focus Forward Project
- Motivational Speech and Book Signing with Susan Burton
- Art Course as Assistant Instructor
- 6 Week Workshop Art and Artists (Presented by the Justice-in-Education Initiative of Columbia University)
- Structured Activity (Aerobics)
- Health Education Sentry Class as Instructor
- Chess Sentry Class as Instructor
- "Child Development and Sexuality" Workshop
- Chess 2 Sentry Class
- Women's Rest- Based Fitness Class
- "Opening the Lines of Communication" Workshop
- "It Takes More Than Talk" Workshop
- Rethink (Columbia University)
- Chess Intro Sentry Class as Instructor
- Structured Exercise Program
- Arts & Craft Workshop
- Alternative to Drug Dealing as Unit Tutor[41]

---

41 *See* Exhibit 1 (certificates).

Ms. Velentzas' positive attitude, caring nature, and aptitude have been recognized by the MDC staff, who have utilized Ms. Velentzas as a course instructor to teach other women at the MDC about art, chess, cardmaking, cardio training, and blood pressure.   Ms. Velentzas has been active in the Suicide Watch Companion Program to provide help for women at the MDC who are experiencing severe depression and suicidal ideation.   Ms. Velentzas also has worked at the MDC as an orderly and as a photographer for recreational activities.   Part of her photography responsibilities are to take photographs of her fellow detainees with their families during Sunday family visit hours and to take photographs on monthly Picture Day.   In the almost five years she has been at the MDC Ms. Velentzas had not incurred a single disciplinary infraction – not one.

After Ms. Velentzas completed the 12-week Focus Forward Project class at the MDC, Interim Director Joel Putnam wrote the following:

> Our volunteers report that Noelle was one of the most active participants in the group and was knowledgeable about a wide range of topics. Always the first to answer, her responses were well thought-out and insightful, often leading into deeper conversations regarding life, decisions, and forgiveness. . . .
>
> Not only was Noelle a gifted speaker, she also provided meaningful, and at times, humorous feedback to the other members of the group. Noelle knows how to navigate vulnerable conversations while simultaneously making everyone feel comfortable and included. She was a great contributor to the discussion of conflict resolution and already embodied the techniques we discussed. It's as if Noelle tries to live her life in the present, always encouraging herself to be the best person and to let things go.   A constant self-dialogue is the best way to describe Noelle's way of thinking. Noelle listens, takes her time to understand the other person's perspective and mindfully decides how to manage the interaction. Noelle would also provide positive suggestions to other group members who shared their own methods of conflict resolution.
>
> Our volunteers describe her as strong, intelligent, honorable and a natural born leader that kept the group interesting and fast paced. Noelle's perception of herself and the world around her took our group discussions

to different levels that were unexpected but beautiful to navigate. Our volunteers report that they are grateful that they had the chance to meet someone like Noelle. It's safe to say there are not many women like her in the world.[42]

Ms. Velentzas' kindness and willingness to help others is reflected in the letters written by two women who have been detained with her at the MDC.[43]

Ms. Velentzas has concrete plans for what she wants to do with her life upon the completion of her sentence.   While in the custody of the BOP, she hopes to learn some type of trade so that eventually she can start her own business to support her family.   She feels tremendous responsibility for not being present with her family and not being able to contribute financially to their well-being.   She particularly is concerned about the welfare of her daughter and making sure her daughter has the financial and emotional security to transition into adulthood – security that Ms. Velentzas never had.

Ms. Velentzas has tried to maintain the most positive life outlook she can considering the harsh circumstances she has been living under at the MDC.   The separation she has endured with her family has been devasting, particularly the separation she has had with her young daughter, who literally is growing up without her mother by her side.

Ms. Velentzas has strong ties with her family, who have been a great source of comfort and support for her.   Today, however, her mother Nadine is basically home-bound.   Nadine's back pain and neuropathy require her to remain lying down most of the day because sitting causes such immediate pain and discomfort.   While Ms. Velentzas has lived as a detainee at the MDC, three of her closest relatives have died: her uncle Steve, her aunt Delia, and her cousin

---

42  Letter of Joel Putnam, attached as Exhibit 2.
43  Exhibits 8 & 9.

Jennifer, who was Ms. Velentzas' closest relative while growing up.   Steve and Dehlia were married; Jennifer died of a fentanyl overdose.[44]   Every minute Ms. Velentzas feels the pain of being separated from her family and of all of the shared family experiences that she and her loved ones are missing, and will continue to miss for the duration of whatever sentence the Court imposes.

## CONCLUSION

A Guidelines sentence recognizing that Ms. Velentzas' offense conduct did encompass at minimum a threat to property and was not calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, results in a sentencing range of 21-27 months.   The Court, however, has found that Ms. Siddiqui's offense conduct resulted in a Guidelines range capped by the statutory maximum of 240 months' imprisonment.   In light of various 3553(a) factors, the Court sentenced Ms. Siddiqui, who engaged in greater criminal conduct by committing the additional crime of lying to federal authorities, to a term of 180 months' imprisonment.

Taking into account the unique history and circumstances of Ms. Velentzas, her overall lower level of culpability compared to Ms. Siddiqui, and the other 3553(a) factors weighing in Ms. Velentzas' favor, it is respectfully requested that the Court impose a sentence below 180 months' imprisonment.

---

44 *See* Exhibit 10 at 9 (photograph of Ms. Velentzas and her cousin Jennifer).

19

Dated: March 2, 2020
  New York, New York

       Respectfully submitted,

       _____/S/_____
       SEAN M. MAHER
       *Counsel for Noelle Velentzas*

       The Law Offices of Sean M. Maher, PLLC
       233 Broadway, Suite 820
       New York, NY 10279
       (212) 661-5333
       (347) 548-9959
       smaher@seanmaherlaw.com